## ROWLEY v. AMERICAN NAT. INS. CO.
### No. 3374. .

Court of Civil Appeals of Texas. Beaumont.

Dec. 31, 1938.

John K. Bracken, W. R. Blain, and David E. O'Fiel, all of Beaumont, for appellant.

Barnes & Barnes, of Beaumont, for appellee.

O'QUINN, Justice.

Appellant sued the American National Insurance Company to recover $511, the amount of an insurance policy issued to Rex Hamilton Rowley, her husband, in which she was the beneficiary. The policy provided double indemnity in case of death by accident. The policy was in force. Insured died from a gun shot wound. Plaintiff, appellant, alleged that insured received an accidental gun shot wound from which he died. Due proof of loss was alleged and was shown. Defendant, appellee, answered alleging that deceased committed suicide, and that the policy provided that if insured committed suicide, whether sane or insane, within two years after the date of the policy, the liability of the insurance company would be limited to the premium paid, and tendered the amount of premium paid in satisfaction of its obligation.

The case was tried to a jury on special issues which were answered favorable to plaintiff, appellant, but the court granted appellee's motion for judgment non obstante veredicto in its favor and denied plaintiff any recovery. Motion for a new trial was overruled, and we have the case on appeal.

The burden was on plaintiff to prove that the deceased did not commit suicide. The jury found: (a) That deceased died from a gun shot wound; (b) that the wound was received accidentally; (c) that deceased did not commit suicide; and (d) that deceased did not shoot himself intentionally. As stated, the court granted appellee judgment non obstante veredicto.

The only question is whether deceased committed suicide. Appellant insists that there is sufficient evidence in the record to sustain the verdict of the jury, that he did not commit suicide and that the court erred in refusing her a judgment on the verdict. Appellee contends that the judgment is correct because the court, under the evidence, could not permit a judgment for appellant to stand.

There is a very full and satisfactory statement of facts. It is in narrative form —no questions and answers. Mrs. Ocelia Rowley, appellant, wife of deceased, was placed on the witness stand by appellee. She testified, in effect, that deceased, with his family, for three or four years prior to his death, had lived on the road between Nederland and Port Neches in Jefferson County, and was engaged in the dairy business; that he disposed of his dairy some four months before his death. That after that he worked at occasional jobs; that he made one trip on a boat as a seaman, and was trying to go on another one; that on the morning of November 26th deceased left home saying he was going to Port Arthur to see if they had called him at the Seaman's Institute; that he did not say then that he was going to stay there until he got a job; that in the afternoon, after he had come back, he told her he was going back and stay until he did get a job. That he carried his sea bag and all of his clothes with him; that after leaving and telling her that he was not coming home until he did get a ship out, he came back that night about 7 o'clock, but did not bring his sea bag; that in about five minutes after he got home he went to bed and stayed in bed until about 7:40; that he got up and came to her and asked for some

tobacco and matches; that he was then dressed; that he then went into the kitchen and sat down and asked what she had there to eat; that she told him she had his supper; that he then went to talking, but she did not know what he said—did not know whether he was talking to her or not; that he told her something about going back to town, got up and went to his room—she was in her room in bed—"He told me good bye right after he closed the door to his room, and I do not know whether it was three minutes or four minutes, or what, I heard a shot. When I went in there, I found him dead. I never saw the gun. He was shot in the face. I did not notice where the bullet came out. It entered the forehead".

While testifying on direct examination, counsel for appellee questioned the witness, Mrs. Rowley, relative to written sworn statement she had made to E. B. Moye, Justice of the Peace and acting coroner, who held an inquest over the body of her husband, and when she had made certain answers counsel exhibited to her the statement and asked her if she made and signed the statement. She admitted signing it but failed to remember much of its contents. Thereupon the statement was offered in evidence. It reads:

"The State of Texas
"County of Jefferson
"Before me, E. B. Moye, a notary public in and for Jefferson County, Texas, on this day personally appeared Mrs. R. B. Rowley, Sr. (Ocelia Rowley) known to me to be the person whose name is subscribed hereto, and who being by me duly sworn, on oath deposed and said:

"My husband formely ran a dairy, but sold it out about a year ago and hasent had any work since that time to amount to anything. He seemed to be very despondent at times.

"He left home at Eight thirty Oclock in the morning of the 26th. to go to Port Arthur to see about getting a Job through the seamens Institute, came home about Three Oclock in the afternoon and packed up sea bag, and said he was going to seamans Institute and stay untill he got a ship out.

"Institute was not taking in seamans any more, but I dident know that untill after his death. Taxi driver told me. So cheked his bag at 700 Taxi, and got Taxi to bring him home. He got home about 7:00 P. M. went to bed called me about 8:00 P. M. for tobacco and papers and matches. I went to bed. He then got up and dressed and went to the kitchen and sat down and asked me what I had to eat. I told him and he said I dont want that. He then begin saying something to himself. Got up went to his room closed the door and called goodbye Celia and shot his selff.

"Signed Mrs. Celia Rowley

"(Seal) Subscribed and sworn to before me this 30th. Nov. A. D. 1934. E. B. Moey Notary Public in and for Jefferson County, Texas."

Continuing her testimony, she said: "He (the Justice of the Peace) brought me that and asked me to sign it and I was in such state of mind that I would have signed anything at that time, I went ahead and signed it. I don't remember anything about it. I don't even remember where I was when I signed. I don't see how I could have told Judge Moye under oath that he seemed to be very despondent before he died, because he wasn't. I suppose that I told Judge Moye that the Institute was not taking any more seamen that day".

On cross-examination, she testified: "I signed this paper when it was presented to me by Judge Moey. It was typewritten like that when he brought it to me. I did not talk to him the night of my husband's death at all; it was the next day. He died November the 26th, and I talked to him on the 27th, the next day. I had no typewriter at my house. I was at my sister's when I signed that. It was written away from my house. When he came back I did not read it over. He didn't read it to me; he just told me he had something he wanted me to sign, that he had fixed up a paper, and I signed it. Whether he correctly interpreted what I had said to him, or whether I made any statement to him that he put in this paper, I don't know, really."

She further testified: "I had not put that pistol away and hidden it. I never did hide it from him; it was always in the same place. It was kept in the wardrobe drawer. The wardrobe was in the other room from where I was sleeping. It was over in the corner of the room where he was lying when I saw him the first time after his death. I don't know how close he was to the wardrobe where the pistol was when I found him dead".

On cross-examination, she testified: "Yes, sir, I was prompted by Judge Moye. He asked me things and I would answer them, and when he wanted me to write things I would write them, and he would tell me, 'was it this, and was it that?' and I really don't know what I wrote. * * * He was supposed to go on a boat; and he was called the day he was buried. I don't really know what the Seamen's Institute in Port Arthur is. It is just a place for sailors to go to find out what ships are coming in or something. It is a place where sailors go to find out whether there is a boat that they can get aboard. That is what he went for. He had been absent during all the forenoon; told me he was going to town. He didn't carry a bag with him that time. * * * But after he had come home at noon, he then packed a bag and told me he was going to Port Arthur to the Seamen's Institute to see whether he had been called on a ship. He returned that night around 7 o'clock. He did not bring his bag with him; he checked it in Port Arthur. He told me something like that he had lost a chance at a ship because he hadn't been down there subject to call; that he was looking for a call; but I don't remember. He told me that he had left his bag at Port Arthur and intended to go back and remain there until he was called out. I do not know whether the seamen sleep at the Institute or not, but that is where they gather up to find out about ships. I don't know whether he ate supper after he asked me about something to eat. I don't remember telling Judge Moye that he did or did not eat supper. All I remember is telling him he said he didn't believe he wanted that. He said he didn't want what I had cooked."

She further testified: "* * * Mr. Rowley met his death in a room adjoining mine. There was no one in that room at that time besides him. The last time that I had seen this gun was about two days before. This was about 8:15 or somewhere around there at night. He didn't tell me where he was going, but told me he was leaving to go some place, about fifteen or twenty minutes before his death. In answer to your question as to what he told me he was going to Port Arthur for, I will say he was looking for a job. He told me good bye about five minutes before he died. The children were in my room. He and I had not had any quarrel or unpleasantness. I do not know of any rea- son why he should be despondent at that time. The family was not suffering any deprivation of any kind. He did not give any evidence of any despondency or desire to kill himself. We were not in destitute circumstances at that time. The condition of his health was good. He was never sick in his life that I know anything about. He was sober when he died. He had not lost any relatives by death in years. * * * Mr. Rowley hasn't any close relatives that I know anything about. His mother died about ten or twelve years ago, or more. He was reared in Port Arthur, mostly. He drank some now and then; but he wasn't drunk that night, absolutely not, when he came home. I don't know anything about anything previous to that, but I know he talked with just as much sense as he ever did when he came home; he was not drunk."

J. Howard Allen, witness for appellee testified: "I am a deputy sheriff, and have been such about three or four years. I was deputy sheriff on November 26, 1934, and as such went to the home of Mrs. Rowley. That was somewhere around eight o'clock, I imagine. I had just come from supper. I found Mrs. Rowley in her bed room, the first room that I entered, and I asked her what was wrong; she pointed at the door and said that her husband had shot himself. I was there in the course of my official duty. I was sent there. When she told me that her husband had shot himself, I stepped in the room just to the left of her bed room. I found Mr. Rowley lying flat of his back and a bullet wound just about the center of the forehead, about an inch from the hair line. The bullet came out of his head at the base of the brain; went clear through his head, but a little down. There was a circle of powder burns, about a four inch circle, on his face. I did see a gun near the head of the deceased, a .45 single action Colt's. I asked Mrs. Rowley about the gun and she said that she had put the gun in the wardrobe, or had hidden it. The head of the body was about two and a half or three feet from the wardrobe. Mrs. Rowley was there with the children, and I asked her what she thought caused it; she said she thought her husband was despondent and out of work, and was figuring on going to Port Arthur that night to catch a boat or something".

R. J. Guidry, witness for appellee, testified in substance that he was the Port

Neches and Nederland agent of appellee and that the company carried a policy of life insurance on deceased. That when he heard of Rowley's death, he went to see Mrs. Rowley. That she told him, "Well, Mr. Guidry, he done it; he killed himself". She said he said he didn't have any more friends, and "there's no use of me to live any more, because all of my friends are gone". That he, Guidry, understood that deceased had gotten rid of his cows gradually as the family would need something to eat—sell a cow every now and then. That he was there one time to collect the insurance premium, and that he helped them (Rowleys) to load their cow into a trailer, and Mrs. Rowley was crying and said "I don't know what is going to happen to us now." "She told me she had to watch him, that he wanted to kill himself and that he had threatened to do it and said she had to watch him". That when he (Guidry) had the death proof filled out, she said "He finally got hold of the gun and blowed his brains out".

On cross-examination by counsel for appellant, he testified that he was agent for the insurance company and wrote the insurance policy. That Mrs. Rowley told him that when he (deceased) got off the boat about two or three weeks before he killed himself, that he was trying to kill himself. That the last date he collected for the insurance was shown on the book. That he collected the premium "even after I knew that he was threatening to kill himself"; that he had to collect as long as they paid the money. That the company didn't discontinue a policy because a man threatened to kill himself.

E. B. Moye, witness for appellee, testified: "I held the inquest when Rowley was killed, at his home * * * I have seen before the paper you show me. The statements therein were made to me. I don't know just who was in the room when I talked to Mrs. Rowley. The best I remember, Mr. Wells and Howard Allen were there. She made statements something similar to those that evening in my presence. I saw her again on the 30th. I was acting coroner, and as coroner it was my duty to hold the inquest. It is part of my official duty to record the testimony upon which I base my judgment. This was the record of the testimony, and after I reduced it to writing I carried it back to her. I believe it was after the funeral; I am sure it was on the date that is on

there. The information that I put in here I got from Mrs. Rowley, every bit of it. She told me that and I reduced it to writing. She looked over that before she signed, and she swore to that statement."

"The paper you now show me is a death certificate. I made it out, which is my duty, under the Bureau of Vital Statistics of the State of Texas. That is my report on this happening. It was filed by me in the course of and in line with my duty under the law. As coroner, I made an examination of the facts as to that occurrence in the house that night. When I got there, Mr. Rowley was lying in the bed room in a pool of blood and when I examined him he wasn't stiff, he hadn't been dead but a short time; I don't know just how long; probably fifteen or twenty or thirty minutes. He was shot right in the center of the forehead, and the bullet came out at the base of the skull in the back, ranging downward. There were powder burns on him, pretty badly burned around the larger portion of his face, I would say. Mrs. Rowley said her husband had killed himself. She said just before the pistol fired, Rex hollered 'Good bye Celia' ".

On cross-examination, he testified: "I wrote that statement, and it was signed on the 30th. She gave me the evidence in the case that night, but I took her testimony on the 30th and she swore to it. It was on the 26th that she made these statements I have been talking about. That was the night that her husband was lying there dead. I did not take the statement back to her home; I went to her sister's house at the Groves, and she was there. I wrote the statement that day that I went out there, which was the 30th. I didn't write it, she wrote it; I came home later and copied it. Mrs. Rowley wrote this. She didn't type it; she wrote it out. I did the typing. She wrote her name to it, but that is not all she wrote. She sketched it off herself with a pencil, at her sister's home, and I took it and typed it. I don't know where that sketch is. She read it over and swore to it. She gave me a statement in writing. I didn't have her sign that one, because I wanted it typed. I made a carbon copy at the time I typed it, and this is a carbon, I believe. That is not my handwriting. As to its being signed 'Celia', when her name is 'Ocelia', well, I don't know whether she signed this one or the original copy. My wife might have signed that one".

On re-direct examination, he testified: "It is possible that I fixed one of them myself, but she swore to that same instrument. I don't know whether that was the carbon or the original. I wouldn't deny her statement that she signed this paper. When I was talking to her in the presence of these two officers, she said this man had been in a very despondent condition for several days; that he had been out of work and didn't seem like he could get anything to do, and had been drinking".

Tom H. Wells, witness for appellee, testified: "I am the person who told Judge Moye about this man being dead the night he was killed. Mrs. Rowley talked to me and Mr. Allen and Judge Moye together at her home that night. I went on into the room where Mr. Rowley was lying on the floor. He was shot. I saw him laying on the floor and he had a bullet hole just above the eyes in the center of the forehead, the bullet ranging down to the base of his head. He was lying in the blood. There were powder burns all over his forehead there. Mrs. Rowley told us that she had been expecting something like that, that she had hidden the pistol in the clothes closet in the room Mr. Rowley was laying in. It seems she had hidden the pistol in one side of the closet and he had to go through a different door to unlock the one on the other side te get to the pistol. I believe she said he did that by using a pocket knife. She said he broke the point of his pocket knife off getting the closet unlocked. She said he was drinking that evening before this killing; said he had been out of work and couldn't get work".

On cross examination, he testified: "I used to be constable; I had some trouble when I was in office and was put out, but I have held office practically ever since. I was removed from office. The reason I know this man had been drinking, he was down town about 30 minutes before he died, and he was drunk. Well, he was drinking, that's what I say. * * * Mrs. Rowley said he had been drinking all day. She told me that that night. Mr. Allen and Mr. Moye were also there at the time she told me that. I don't know why Mr. Moye didn't put that in her statement, nor why he didn't put in the statement that Mr. Rowley had broken his knife opening a door to get the gun; but she made that statement in the presence of him and Mr. Allen. * * * We didn't each take her off in a corner and question her. * * * I don't know whether it is true that each one of us has testified to a different statement of what she said; I am testifying to the facts of what happened that night, * * *".

Mrs. Ocelia Rowley, recalled by appellant, testified: "At the time my husband was killed, I had four full grown cows and two heifers. I have one cow and a heifer left. When we sold the cows to dairymen down there, the best I remember, we sold six at one time. Those were the first ones we had sold. After he sold the dairy out, we sold one cow to a man in Port Arthur. That was a good milk cow. * * * That was all that had been sold before my husband's death except one I sold to my cousin for which I had not collected until after he died. I heard Mr. Guidry testify about my crying at some time he was there, telling him that was the last of the cows and that we had to sell it to get something to eat. That is not true. I never talked to him about anything but the insurance policy * * *. I did not make any statement to Mr. Guidry or in his presence about my husband threatening to kill himself. As to hiding the pistol, I always kept it hid around some place, on account of the children; I never wanted them to get hold of it. * * * I never talked to any one the night he died but Allen. He came and handed me a paper he got out of his pocket, and handed me the gun and asked me if he had killed himself, and I said yes, and that's all he asked me. I don't remember seeing anyone else there. If they were there I didn't see them, because I never went in that room at all. The gun was in my wardrobe the last time I saw it before this killing, it was in the top drawer. This drawer was about four feet high. I didn't find any broken knife blade in that drawer. I don't know where he got that statement."

Oliver Bosman, called by appellant in rebuttal, testified in substance: That he had known Rowley, and at one time was his step-father; that at the time of Rowley's death he had about a half dozen cattle left; that he saw and talked with him on the morning of the day of his death; that Rowley did not make any complaint about his financial condition; that it wasn't that, he knew it wasn't that; that Rowley was depressed when Bosman was talking to him; that he was not drinking that morning when he saw him, there didn't seem to be

178

anything wrong; that he went to Rowley's home the night he died and saw the body laying on the floor; that he saw the bullet wound, it was in the middle of the forehead, and that he did not see where the bullet came out.

We have brought into this opinion all of the evidence in the record that we thought had bearing on the question of accidental death, or death by suicide. We think all of the evidence shows unmistakably that deceased committed suicide. The court could not have permitted a judgment for appellant based upon the jury's verdict to stand. It was wholly without support in the evidence.

The judgment should be affirmed, and it is so ordered.

Affirmed.